IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MAFAYETTE FIELDS,

                        Plaintiff,

    v.

KRISTINE DEYOUNG, KERRY NEWBURY,                    OPINION and ORDER
SARA FRY, DONALD MORGAN,
MEREDITH MASHAK, SALAM SYED,                           16-cv-405-jdp
MICHAEL DITTMAN, JON LITSCHER,
JAMES GREER, RYAN HOLZMACHER,
MARY MUSE, DILIP TANNAN,
BETTY KATZUR, NANCY BOWENS,
TERRY MURPHY, and JEAN PATENAUDE,

                        Defendants.[1]

---

Plaintiff Mafayette Fields, appearing pro se, is an inmate at Oshkosh Correctional Institution. He suffers from a painful bunion and bone spur on his left foot. He alleges that medical staff at the Oshkosh prison and Columbia Correctional Institution improperly treated his foot problems by choosing ineffective treatment and that Department of Corrections "Special Needs Committees" would not give him treatment prescribed by his doctors. Fields's original complaint included claims only about his treatment at Columbia Correctional Institution. In a June 19, 2018 order, I allowed Fields to amend his complaint to include later claims about his treatment at Oshkosh Correctional Institution and I gave the parties a chance to submit supplements to their cross-motions for summary judgment.

---

[1] I have amended the caption to provide defendants' full, properly spelled names.

The parties have supplemented those motions and they are ready for review.[2] Fields's dissatisfaction with the treatment he received is understandable. But I conclude that Fields fails to show that any of the defendants acted with deliberate indifference toward his foot problems, so I will deny Fields's motion for summary judgment, grant defendants' motion, and dismiss the case.[3]

UNDISPUTED FACTS

The following facts are drawn from the parties' summary judgment materials and are undisputed unless noted otherwise.

## A. Parties

Plaintiff Mafayette Fields is currently an inmate at Oshkosh Correctional Institution. The events relevant to this lawsuit occurred while Fields was incarcerated at either Oshkosh Correctional Institution or Columbia Correctional Institution. Several of the defendants worked at Columbia Correctional Institution during this time: Salam Syed was a physician, Kerry Newbury and Kristine DeYoung were nurses, Donald Morgan was a captain, Sara Fry was a unit manager, Meredith Mashak was the health services manager, and Michael Dittman was the warden. Several of the defendants worked at Oshkosh Correctional Institution: Dilip Tannan was a physician, Betty Katzur was a nurse clinician, Terry Murphy was an institution

---

[2] Fields supplemented his own motion for summary judgment by asking the court to accept his materials from his original motion, *see* Dkt. 101, which already included proposed findings regarding his new claims against officials at Oshkosh Correctional Institution. I will grant that motion.

[3] Defendants have filed a motion to stay the pretrial-submission deadlines. Dkt. 113. But because I am dismissing the case at summary judgment, I will deny this motion as moot.

complaint examiner, Nancy Bowens was a nurse practitioner, and Jean Patenaude was a Psychological Services Unit office operations associate. Other defendants worked for the Department of Corrections' Bureau of Health Services: James Greer was the director, Ryan Holzmacher was the medical director, and Mary Muse was director of nursing. Jon Litscher was the secretary of the Department of Corrections.

## B. Columbia Correctional Institution

Fields suffers from a bunion, bone spur, and overlapping of toes on his left foot. He says that he suffers foot pain because of these problems. On August 20, 2015, Fields had an appointment with defendant Dr. Syed. Fields complained of knee pain, for which Syed referred him to a physical therapist for a knee brace. Fields also requested alternative footwear. Syed noted that Fields had a bunion on his foot. Syed wrote a "prescriber's order" stating "Ref. Special Needs – Re – need state shoes Bunion – hallux valgus." Dkt. 75-1, at 4. Under DOC Bureau of Health Services policy no. 300.07, the prison used a "Special Needs Committee" to review inmate requests for special needs, accommodations, or restrictions. Syed wanted the committee to review whether Fields should receive "soft-top" shoes, like sneakers or tennis shoes. Syed says that in severe cases, bunions may be treated with surgery, but he did not consider Fields's bunion to be serious. However, Syed thought that Fields would be more comfortable with a soft-top shoe, and he responded to a request for admission by admitting that Fields had a "medical need" for the shoes. Dkt. 60-3, at 3.

The membership of the Special Needs Committee rotates among security, administrative, and nursing staff, but there is always at least one medical professional on the committee. Treating medical staff are generally directed to refer requests for health-related property items or accomodations to the committee rather than write orders for particular items

themselves. The policy directs the committee to use guidelines attached in an appendix to the policy and "[e]stablished nursing protocols" to decide whether particular items or accommodations are appropriate. The policy also says, "A significant medical/dental condition which clearly indicates that a restriction/special need is medically necessary must exist for health services to get involved." *Id.* at 2. The committee is expected to consider security concerns when addressing a request. "Unresolved security concerns" are ultimately decided by the warden and the Bureau of Health Services medical director. *Id.*

The appendix states the following about shoes:

> [The Health Services Unit] does not issue, purchase, or authorize special purchases if the inmate is able to wear regular shoes (common shoes that can be purchased from a store or catalog). Inmates should be encouraged to purchase their own personal shoes. If a patient is not able to wear the State supplied footwear due to a significant medical condition (i.e. diabetic with foot ulcers or need for Velcro shoes due to a CVA for independent ADL) and provision of an alternative off the shelf shoe is necessary, the facility shall provide an alternative. These cases are to be very limited and determined on a case by case basis through the established committee/nurse review.

Dkt. 78-1, at 8. This policy was signed and adopted by several administrative officials in the Department of Corrections, including defendant Greer.

All Wisconsin inmates are issued one pair of brown leather boots at state expense, and they are encouraged to purchase up to two pairs of personal shoes, which may be boots or tennis shoes, at inmate expense. If an inmate were to meet the criteria for an alternative shoe stated above, the inmate would be provided black tennis shoes with Velcro straps. At the time Dr. Syed referred Fields to the Special Needs Committee, Fields owned a pair of Reebok tennis shoes.

Fields filed a health service request about his foot problems. He was seen by defendant Nurse Newbury on August 27, 2015. Newbury noted the bunion and bone spur. Fields said that his pain was 3 on a scale from 0 to 10 at the time, and that at worst—when Fields slept on his stomach—the pain was 7. Fields indicated that his tolerable pain level was 0 out of 10, meaning that any pain was intolerable. Newbury thought that Fields would be more comfortable in soft-top shoes. But she said that Fields's referral to the Special Needs Committee was pending, and that Fields should try sleeping on his back. She did not believe that a nursing follow-up appointment or referral to an advanced care provider was necessary.

On September 17, 2015, Fields submitted a health service request asking what was happening with his knee-brace order and the referral to the Special Needs Committee. The next day, defendant Newbury responded "laundry is aware of need for fit of new state boots[,] no black shoes were approved/issued for you at this time. You will see PT for brace." Dkt. 1-1, at 16. Fields followed with an undated health service request, in which he stated:

> Dr. Syed requested black Velcro shoes, because I have a bone coming out of the top of my foot and one bulging out of the side of the same foot. The committee denied this request by the Dr. and I disagree with the committee's decision. The Dr. stated I'll need surgery on my foot and the boots are painful. I was instructed by the inmate complaint Dept. to attempt to resolve the issue.

Dkt. 1-1, at 17. Defendant Nurse DeYoung responded on September 29, 2015, stating that Fields was directed to contact the property department to be resized for a larger boot, and asking whether he had done so.

Fields filed an inmate grievance challenging the committee's denial of alternative footwear, but the complaint examiner dismissed the grievance after consulting with defendant Mashak, who stated that the committee had not yet considered his request for alternative

footwear. The prison official reviewing this dismissal ultimately ruled that the grievance should be dismissed "with modification," saying that Syed's order was "vague and does not indicate that any special shoes [were] recommended or ordered." Dkt. 1-1, at 5. On November 4, the reviewer recommended that Syed clarify his order so that appropriate footwear would be provided. *Id.* But Syed did not clarify the order. Syed says that he did not need to clarify it because he was not officially recommending or ordering a particular shoe; he meant to refer the matter to the committee. If he had thought that Fields's foot problems required particular care or type of shoe, he would have clarified the order.

The Special Needs Committee considered Fields's request on November 5, 2015. Defendant Unit Manager Fry was on the committee, along with non-defendants Nurse Diane DeJager and ADA Coordinator Pam Schmidt. Nurse DeJager reviewed Fields's medical chart and concluded that Fields did not have a significant medical condition entitling him to alternative footwear. The committee denied Fields's request, although Fields was still allowed to purchase additional soft-top shoes from an outside vendor if he wanted to.

**C. Oshkosh Correctional Institution**

Defendant Dr. Tannan first saw Fields in September 2016, after Fields's transfer to Oshkosh Correctional Institution. Tannan ordered an x-ray of Fields's left foot; it showed a healed previous fracture of the left fourth metatarsal consistent with the bone spur on the top of his foot.

In October 2016, Fields requested a bottom-bunk restriction because of his foot and knee pain. A nurse assessed Fields and submitted his request to the Special Needs Committee. A majority of the committee was medical staff: defendants Dr. Tannan, Nurse Clinician Betty Katzur, and Nurse Practitioner Nancy Bowens served on the committee alongside non-medical

staff, complaint examiner Terry Murphy and Psychological Services Unit office operations associate Jean Patenaude.[4] The committee denied his request. Unlike with the decision by the Columbia Correctional Institution committee, defendants do not provide evidence explaining the decision-making process used by this committee.

Fields next saw Tannan on April 7, 2017, and Tannan referred Fields to the property department for wider boots. *See* Dkt. 35-1, at 1. The parties do not clearly explain the timeline, but it appears that Fields did not receive the wider boots prescribed by Tannan for a couple of months after the April 7, 2017 appointment. *See* Dkt. 108-2, at 4 (Fields's June 7, 2017 health service request stating that he had still not received the boots); Dkt. 104-1, at 10 (June 16, 2017 medical notes indicate that Fields received boots on June 15). However, there is no indication that the delay was Tannan's fault, as opposed to the property department's. *See* Dkt. 104-1, at 11 (April 18, 2017 medical note stating that popery department was emailed about order for new boots); Dkt. 108-2, at 5 (In a June 8, 2017 health service request, Fields states that months ago Tannan emailed a lieutenant in the property department about the boots, yet Fields had still not received them from the property department.).

Then on July 3, 2017, Fields—apparently wearing the new boots—tripped on the stairs and sprained his right ankle. A nurse gave him a low-bunk restriction for two weeks and ibuprofen. Tannan extended the low-bunk restriction for two months and referred Fields to property for resized boots. Tannan later extended the low-bunk restriction for another two

---

[4] Defendants' summary judgment materials state that these were the five members of the committee. But the actual source for their proposed findings is a response to an interrogatory, in which defendant state that physicians Patrick Murphy and Phillip Wheatly also served on the committee. *See* Dkt. 60-6, at 2. Either way, medical professionals outnumbered non-medical staff on the committee.

months. Tannan also gave Fields an ankle brace, which Fields said helped when he played sports. On July 10, Tannan saw Fields, who stated that his bunion was no longer rubbing on the new boots. Fields disputes this, but he does not cite any evidence supporting his version of events.

Fields received further treatment following the date of the events discussed in his amended complaint. Fields developed a painful corn on his right foot and was given bandages or "corn caps" to alleviate that pain. On December 8, 2017, Tannan saw Fields, who stated that the arch supports helped with his pain. Fields says that he meant only that his arch pain was better, not the pain from his bunion or bone spur.

On December 16, 2017, Fields filed a health services request stating that he had received a pair of boots on "the 12th," which I take to mean December 12, but the new boots "hurt just as bad as all of the boots [he had] received from property." Dkt. 86-4. That request was forwarded to the Special Needs Committee, but neither party explains whether the committee ruled on the request or who served on the committee.

In February 2018, Tannan saw Fields and noted that Fields's bunion hurt after strenuous activity. Tannan submitted a form for authorization for "non-urgent" care, for a podiatrist to see Fields to evaluate him for potential surgery. But the DOC medical director denied the request, stating:

> For surgical treatment to be indicated, the patient must have pain that is not alleviated by a simple change of shoes or by other, conservative treatments . . . . If evidence of conservative treatment shows failure, will then approve.

Dkt. 104-1, at 27. Tannan stated that he would continue "conservative" treatment.

On March 16, 2018, Fields filed a health service request about foot pain, but when he met with the nurse he said that he no longer felt pain. Fields states that he was not talking

about his bunion pain. At a May 25, 2018 appointment, Fields says that Tannan told him that he had to deal with the pain and that "everyone has foot problems." Dkt. 108-5, at 1. Tannan says that the bunion was "stable."

ANALYSIS

## A. Summary judgment standard

Summary judgment is appropriate if a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When, as here, the parties have filed cross-motions for summary judgment, I must consider the burden of proof each party would bear on an issue at trial, and then require the party with the burden to produce evidence showing that they have proven that issue; if the party fails to provide evidence in support of a particular issue that they must prove at trial, I may enter summary judgment against that party. *See Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997); *Mid Am. Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995).

The Eighth Amendment prohibits prison officials from acting with deliberate indifference to prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). A medical need is serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371–73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm. *Farmer*,

511 U.S. at 847. To be considered "deliberately indifferent," an official must know of and disregard "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

**B. Dr. Syed**

I granted Fields leave to proceed on a claim that defendant Dr. Syed ordered him soft-top shoes rather than surgery for his foot problems. In his brief, Fields says that Syed determined that "surgery was required" but that he ordered soft-top shoes as an alternative. Dkt. 58, at 10. But this is not borne out by either parties' proposed findings of fact or supporting evidence. The evidence shows that Syed thought that soft-top shoes would make Fields more comfortable, but not that Fields needed surgery. And as I will discuss further below, Syed also did not actually "order" the shoes: he referred Fields to the Special Needs Committee for that determination.

Defendants contend that Fields's bunion and bone spur are not objectively serious enough to be a "serious medical need" within the meaning of the Eighth Amendment, citing district-court cases for the proposition that "bunions and other foot conditions are not sufficiently serious to meet the high standard of the Eighth Amendment." Dkt. 66, at 13 (citing *Brown v. DeFrank*, No. 06 CIV 2235 AJP, 2006 WL 3313821, at *21 (S.D.N.Y. Nov. 15, 2006) ("[P]risoner complaints about bunions or other foot problems do not establish the objective prong of the deliberate indifference standard."); *Hernandez v. Goord*, 02 Civ. 1704, 2006 WL

2109432 at *1, 5–6 (S.D.N.Y. July 28, 2006) (plaintiff's painful injured left foot diagnosed as hammertoe with an overlap not severe enough for deliberate indifference claim); *Fife v. Hensley*, 06cv0203, 2007 WL 9656074 (N.D. Tx. Dec. 6, 2007) (bunion not a serious medical need)).

But these district court rulings are not binding upon this court, nor is the case law unanimous about these types of injuries. *See Jones v. Drew*, 221 F. App'x 450, 453 (7th Cir. 2007) ("[t]he district court concluded that Jones presented sufficient evidence for a jury to conclude that the bunions were a serious medical need"). Additionally, Syed himself concedes that severe cases of bunions may be treated with surgery. Defendants also responded to a request for admission by stating that Syed admits, albeit vaguely, that he had "seen a medical need for soft-top shoes, due to plaintiffs' foot problem." Dkt. 60-3, at 3. I cannot say as a matter of law that bunions and bone spurs fail to meet the serious-medical-need standard. And Syed's admission, along with Fields's testimony about the pain he suffered, are enough to raise a disputed issue of material fact over whether his particular problems were objectively a serious medical need.

But Fields still needs to show that Syed acted with deliberate indifference to the need. He fails to present any evidence showing that surgical intervention was necessary at that point, instead of other, more conservative, treatment. As stated above, there is no evidence that Syed actually came to the conclusion that surgery was necessary, yet denied Fields that option. All Fields has to support this theory is his own speculation that surgery was necessary, which is not enough to defendant a motion for summary judgment. *See Brown v. Advocate South Suburban Hosp.*, 700 F.3d 1101, 1104 (7th Cir. 2012).

## C. Nurse Newbury and Special Needs Committee at Columbia Correctional Institution

Fields also brings claims that defendant Nurse Newbury and the Special Needs Committee—consisting of defendants Nurse DeYoung, Captain Morgan and Unit Manager Fry—countermanded Syed's order for soft-top shoes. I said the following in screening these allegations:

> Fields also alleges that defendant Nurse [Newbury] "determined" that he did not need the shoes, and that the Special Needs Committee followed by rejecting Syed's order for soft-top shoes despite at least two of the members (Morgan and [Fry]) not having medical expertise, and without waiting for Syed to clarify his recommendation, as directed by a grievance examiner. It is unclear exactly how [Newbury] and the committee's decision are related, but Fields's allegations raise an inference that [Newbury] and all of the members of the committee willfully chose to ignore the doctor's expert suggestion for treatment, which could also support a deliberate indifference claim.

Dkt. 16, at 4.

The parties' summary judgment materials clarify aspects of these claims. First, it is undisputed that defendants DeYoung and Morgan were not on the committee that considered Fields's shoe request.[5] So I will dismiss them from the lawsuit.

The parties' materials also detail Newbury's assessment, and it is now clear that this assessment was not part of the Special Needs Committee process. Newbury responded to Fields's report of increased pain while sleeping by saying that he should try sleeping on his

---

[5] Defendant DeYoung responded to one of Fields's health service requests by asking whether he had followed up on previous advice by trying wider boots, but I did not allow him to proceed on a claim about this interaction. Even if that interaction were part of this lawsuit, Fields does not show that DeYoung was deliberately indifferent to his foot problems: it was appropriate for DeYoung to follow-up about the previous advice to wear wider boots, and at the time, the matter was still before the Special Needs Committee, so there was no reason to think that DeYoung had the responsibility to pursue the matter further.

back. That was a reasonable attempt to resolve the specific complaint Fields raised. Newbury also noted that Fields's request was still pending before the Special Needs Committee, so his foot problems were already being addressed. Her deferral to the committee's process does not show deliberate indifference on her part. I will grant defendants' motion for summary judgment on this claim against Newbury.

As for defendant Fry, she was one of the two non-medical employees on the Special Needs Committee who considered Fields's shoe request. But Fields's theory that the non-medical committee members decided his request is not supported by the parties' proposed facts. Defendants show that Nurse DeJager (who is not a defendant) first considered the request by reviewing Fields's medical chart. From those records, she thought: that Syed did not consider the foot problems serious enough to warrant direct medical treatment; that Fields's statements to Nurse Newbury about increased pain while he slept suggested that shoes would not solve that aspects of Fields's problems; and that Fields's apparent failure to try wider boots suggested that he did not have a truly serious need. She concluded that Fields did not suffer from a "significant medical condition." She advised the other, non-medical members of this. She does not explain whether the three members took a formal vote, but the only reasonable inference from the facts here is that the committee's decision was based on DeJager's medical opinion. There is no evidence that the non-medical personnel on the committee outvoted DeJager. So I grant defendants' motion for summary judgment on the claim against Fry.

As for Fields's theory that the committee ignored Syed's order for soft-top shoes, the evidence presented by the parties shows that Syed did not "order" the shoes. Instead, he noted only a potential need for them and referred the matter to the committee. The committee, led by DeJager, made a decision after considering Fields's medical records, as contemplated by the

Special Needs Committee policy. The committee did not countermand an order, or even a recommendation, from Syed.

Fields also takes issue with how the committee ruled on the referral without waiting for Syed to clarify the referral. After a grievance examiner concluded that Syed's referral was ambiguous "and [did] not indicate that any special shoes [were] recommended or ordered," Dkt. 1-1, at 5, Syed did not amend his decision. The next day, the committee went ahead and reviewed the referral. There is no evidence that the committee reached out to Syed, nor is there any evidence showing that the committee knew that Syed stood by his original referral. The committee's decision to plow ahead with consideration of the shoe request was arguably negligent, because it stands to reason that the committee would want up-to-date and clear information from Fields's medical provider. But no reasonable jury could conclude that the committee members acted with deliberate indifference, because as stated above, Nurse DeJager reviewed the medical records herself to assess the seriousness of the injury, and she did not countermand directions from Syed. As for Fry, the only member of the committee who is a defendant, she was entitled to rely on DeJager's medical determination. *See, e.g.*, *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012).

## D. Supervisory officials and official-capacity claims

Fields alleges that defendants Greer, Holzmacher, Muse, and Litscher created the Special Needs Committee policy allowing non-medical personnel to overrule doctors' recommendations, and that defendants Mashak and Dittman were aware that the policy allowed for non-medical professionals to make decisions but they allowed the policy to continue to be used. A supervisor can be liable under the Eighth Amendment for "personally devis[ing] a deliberately indifferent policy that caused a constitutional injury," *Armstrong v.*

*Squadrito*, 152 F.3d 564, 581 (7th Cir. 1998), or for "facilitat[ing]" or "turn[ing] a blind eye" toward the problem, *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995).

Defendants state that only Greer was part of the team creating the Special Needs Committee policy, so the other defendants should be dismissed. Fields does not detail the other defendants' involvement regarding the policy other than to say that each of them was aware of the systemic problems caused by the policy. But to survive summary judgment he needed to explain in greater detail exactly how each of the defendants condoned the policy or turned a blind eye to the problems it caused. He fails to do this. The only one of these defendants who appeared to have any direct involvement with the events of this case is Mashak. But her involvement was limited to telling the complaint examiner that Fields's grievance was premature because the Special Needs Committee had not yet considered his request. That does not raise a reasonable inference that Mashak knew that the policy would harm Fields.

That still leaves Greer, who co-authored the policy. It also leaves Fields's official-capacity claim about the policy itself. To prevail on an official-capacity claim, Fields needs to show that a policy or custom of the state played a part in the alleged constitutional deprivation. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

So the remaining question is whether the Special Needs Committee policy caused a constitutional deprivation. Fields initially contends that it did, by either allowing non-medical professionals to overrule Syed's order for soft-top shoes, or by allowing Nurse DeJager to overrule Syed. But as discussed above, Fields does not provide any evidence showing that non-medical staff overruled the orders of medical professionals. Additionally, Syed never actually prescribed Fields the shoes, so neither the non-medical-staff members nor Nurse DeJager actually ever overruled Syed.

Syed *referred* the matter to the Special Needs Committee, leaving the final decision to the committee. I take Fields to be arguing that the policy allowed the non-medical-staff members of the committee to outvote DeJager, thereby overriding a medical professional's view of his medical needs. The policy does not say exactly how members come to a final decision, or more particularly, whether non-medical staff could theoretically outvote the medical professionals on the committee. But there is no evidence that this occurred in this case; quite the opposite. It was Nurse DeJager herself who concluded that Fields did not have a significant medical need that required the shoes. Fry says that she deferred to DeJager's expertise, and Fields does not provide any evidence disputing DeJager's and Fry's testimony.[6] The only evidence here shows that the Special Needs Committee followed the advice of the medical professionals.

In his reply, Fields raises a new theory: that the policy eliminates the doctor's "medical autonomy" by forbidding a doctor from prescribing certain types of items, including shoes. Defendants say that doctors retain autonomy: the policy states that "providers" may provide certain types of items without committee review, such as splints, crutches, and wheelchairs. They also submit another policy, Division of Adult Institutions Policy 500.10.01, titled "Medical Autonomy," that says, "Qualified health care professionals shall have the autonomy

---

[6] It is understandable why Fields thought that non-medical professionals might have determined the ruling on his shoe request: the policy itself is silent about the procedure used by the medical staff and non-medical staff to make their ruling. And the written decision given to Fields was extremely terse and did not explain the roles DeJager and the non-medical staff members played in arriving at the decision. That lack of clarity might lead someone to assume that the committee simply voted on it.

to make clinical decisions regarding medically necessary health care provided to inmate patients."[7] Dkt. 78-2, at 1.

But unlike parts of the Special Needs Committee policy discussing items like splints, crutches, and wheelchairs, the policy section discussing shoes does not include language stating that a medical provide may directly prescribe them. Nor is it clear what to make of the "Medical Autonomy" policy, given that one of the clear purposes of the Special Needs Committee policy is to prevent doctors from prescribing so-called "comfort items" to prisoners. *See* 78-1, at 2–3. For example, the Special Needs Committee policy states:

- "Prescribing practitioners shall refer items to the committee/nurse for review of special needs rather than write orders for specific items."

- "The security level and physical environment of the facility must be considered when authorizing special needs/restrictions. Alternatives shall be considered"

- "Comfort Items shall not be approved by HSU. The most common incorrect assumption about such items is that they are medically necessary for proper medical care. This is not the case for the vast majority of medical conditions. Requests for these types of items are not medical issues. HSU staff is encouraged to allow only those treatment items which have been scientifically shown to provide solid medical benefit, and to treat significant medical conditions."

*Id.*

Nonetheless, Fields fails to show that he could succeed at trial on either an official-capacity claim against the policy itself or against Greer for helping to promulgate the policy. As I stated in a previous similar lawsuit, "There is nothing inherently unconstitutional about allowing security staff to have input about the distribution of comfort items in prison cells," even where the policy serves to steer medical personnel away from prescribing certain types of

---

[7] Defendant Greer has authenticated the policy, although I note that the signature block on the policy document he submitted is unsigned by him or the other officials listed in the signature block. Dkt. 78-2, at 2.

treatment where others are also available. *Walker v. Cox*, No. 15-cv-686-jdp, 2017 WL 5136159, at *7 (W.D. Wis. Nov. 6, 2017). The mere fact that the policy directs doctors to forward these types of requests to the committee is not enough to maintain a constitutional claim against the authors of the policy or against state officials on an official-capacity basis.

That is not to say that every application of the policy will necessarily be constitutionally acceptable. By adopting the Special Needs Committee policy but not making it crystal clear how the committee members are supposed to weigh medical versus security concerns, or by how to weigh recommendations provided by treating physicians, the state has potentially opened its employees to constitutional-deliberate-indifference or state-law-negligence claims. Giving non-medical staffers influence in the decision-making process and divesting doctors of the final call on some of these requests could lead to a scenario where a doctor's recommendation for medically necessary care is countermanded by someone without the medical expertise to do so. But Fields has not produced evidence that this is what happened in this case. So the facts here do not support a constitutional claim and Fields does not bring negligence claims against any of the defendants. I will grant defendants' motion for summary judgment on the claims against Greer and on the official-capacity claim.

**E.  Dr. Tannan**

I allowed Fields to amend his complaint to include additional claims about his treatment after he was transferred to Oshkosh Correctional Institution. He alleges that, starting in April 2017, defendant Dr. Tannan forced him to wear boots that Fields complained did not help with his pain, and that Tannan did not send him to see a specialist.

Defendants argue that the claim about the specialist must be dismissed because Tannan did request a podiatry consultation, but that request was rejected. It is true that Tannan

*eventually* requested a podiatry consultation in February 2018, but Fields's claim concerns his foot problems once he started complaining about the new, larger boots not helping. Exactly when Fields started complaining about the boots is unclear, although his amended complaint is dated September 18, 2017, so it must have been before then.

Tannan saw Fields for a host of medical issues, including his bunion and bone spur, a hyperextended second toe on his left foot, and fallen arches on both feet. In considering the claims against Tannan, I must consider the totality of care Fields received, not just individual decisions. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). And the record shows that Tannan provided Fields with treatment for these problems. Fields contends that Tannan's relatively conservative treatment decisions violated the Eighth Amendment. But to maintain an Eighth Amendment claim, Fields would need to show that Tannan's decisions were so far outside the scope of accepted medical practice that the decisions were not truly based in professional medical judgment, *see Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996), or that Tannan persisted in treatment that he knew was ineffective.

Fields fails to make these showings. Fields does not provide any evidence suggesting that choosing arch supports and larger shoes rather than jumping straight to surgery was unreasonable. Prisoners do not have a right to choose the treatment they will receive for a given medical condition. *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996). The provision of the larger boots was delayed through no fault of Tannan's. Then, when Fields sprained his ankle in July 2017, a nurse and Tannan treated that problem, giving him a bottom-bunk restriction and ibuprofen, and ordering resized shoes. This also at least indirectly treated the bunion and bone-spur problems and it shows that Tannan was not deliberately indifferent to Fields's problems.

Tannan did not see Fields again before the date of the amended complaint, so there is no evidence suggesting that Tannan knowingly persisted in ineffective treatment. And Tannan indeed eventually referred Fields for bunion-surgery approval, although it occurred after the date of Fields's complaint and the decision is not technically a part of Fields's claims. Tannan's request was denied, which leads Fields to argue that, similar to his claims about the Special Needs Committee, the DOC has stripped doctors of autonomy by having to seek approval for a specialist consultation. But Fields did not bring a claim about the consultation denial, so I will not consider it further. Fields also says that Tannan told him in May 2018 to deal with his pain and that "everyone has foot problems," but this visit long postdates the events discussed in the amended complaint, and it occurred only after Tannan's attempt at having Fields seen by a specialist was stymied by DOC staff. It does not raise a reasonable inference that Tannan's earlier decisions were deliberately indifferent.

## F. Special Needs Committee at Oshkosh Correctional Institution

Fields brings Eighth Amendment claims about the Special Needs Committee's handling of his request for a low-bunk restriction at Oshkosh Correctional Institution. Similar to his claims regarding the committee at Columbia Correctional Institution, Fields alleges that the committee's non-medical-staff members overruled a doctor's prescribed or recommended treatment or unduly influenced the decision-making in his request. He also brings an official-capacity claim about the Special Needs Committee regulation.

In opposing Fields's motion to amend his complaint to add those claims, defendants previously raised an argument that Fields failed to exhaust his administrative remedies regarding the committee's decision. I rejected defendants' exhaustion argument as undeveloped but I stated that defendants were free to renew the exhaustion argument in their supplemental

motion for summary judgment. *See* Dkt. 97, at 2–3. Defendants have done so, but I need not consider the exhaustion issue, because Fields loses on the merits of his claims.

None of Fields's theories for how the committee members violated his Eighth Amendment rights are supported by the parties' proposed facts. There is no evidence that defendant Tannan or any other doctor prescribed or even recommended that Fields receive the bottom-bunk restriction during the timeframe at issue. Instead, the nurse who examined him after his request concluded that he did not need the restriction, and then the committee denied him the restriction. It is undisputed that the committee was made up of a majority of medical staff members, including Dr. Tannan. Defendants do not provide evidence explaining the decision-making process in this committee, but neither does Fields, and it his burden to submit evidence supporting his claims. From the record before me, no reasonable jury could conclude that the non-medical-staff members of the committee denied him the restriction over the expert recommendation of medical staff, or even that the non-doctor members overruled Tannan. I will grant defendants summary judgment on these claims.

Fields also brings an official-capacity claim about the Special Needs Committee regulation, but it fails for the same reasons as his claim regarding the committee at the Columbia Correctional Institution. He believes that there is something illegitimate about the committee including members who are not medical professionals. The state argues that the policy does not restrain doctors nearly as much as Fields believes it does, stating that Tannan could have ordered a bottom-bunk restriction any time he wanted if he thought it was warranted. And Tannan indeed did gave him that restriction later, after Fields sprained his ankle. But Fields points out that the policy allows for nurse- or doctor-issued short-term bottom-bunk restrictions for "acute" injuries, *see* Dkt. 78-1, at 9, and it does not contain an

explicit corresponding provision for chronic injuries. Fields appears to be correct that the policy restricts doctors from independently issuing certain types of restrictions without committee approval, although as stated above, the interplay of the committee policy and doctor-autonomy regulations makes the full scope of prison doctors' authority unclear. Prisoners and medical staff alike would likely benefit from amendments to the policies that more explicitly detail the limits of what doctors are able to prescribe. But given the facts of this case, the policy did not cause Fields to be deprived of treatment to which he was constitutionally entitled. So I will grant defendants summary judgment on the official-capacity claim.

## G. Qualified immunity

Because I am granting summary judgment to defendants on the merits of each of Fields's claims, I need not address defendants' qualified immunity defense.

ORDER

IT IS ORDERED that:

1. Plaintiff Mafayette Fields's motion for the court to accept his previous summary judgment materials as his materials in support of his claims regarding the Oshkosh Correctional Institution officials, Dkt. 101, is GRANTED.

2. Plaintiff's motion for summary judgment, Dkt. 57, is DENIED.

3. Defendants' motion for summary judgment, Dkt. 65; Dkt. 102, is GRANTED.

4. Defendants' motion to stay pretrial-submission deadlines, Dkt. 113, is DENIED as moot.

5. The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered November 15, 2018.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge